| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>1437 Bannock Street<br>Denver, Colorado 80202<br><br>**Plaintiffs**: NICOLE WALTERS as an individual, NICHOLAS WALTERS as an individual, and SHARI WALTERS as the personal representative of the Estates of Jill and Michael Walters<br><br>v.<br><br>**Defendants**: CWRV TRANSPORT, LLC, an Indiana Limited Liability Company, BINGO TRANSPORTATION, INC. d/b/a WAVE EXPRESS, an Indiana Corporation, MARION SCHROCK, an individual; and PAULINE SLABAUGH, an individual<br><br>*Attorneys for Plaintiffs*<br>SWEETBAUM SANDS ANDERSON PC<br>Alan D. Sweetbaum, Esq. #13491<br>1125 Seventeenth Street, Suite 2100<br>Denver, Colorado 80202<br>Phone No.:  (303) 296-3377<br>Email:  asweetbaum@sweetbaumsands.com<br><br>THE DAN CAPLIS LAW FIRM, LLC<br>Daniel J. Caplis, #13171<br>Babar Waheed, #38273<br>Plaza Tower One Penthouse<br>6400 South Fiddler's Green Circle, Suite 2200<br>Greenwood Village, CO 80111<br>Telephone:  303-770-5551<br>Fax:  303-770-5552<br>dan@caplislaw.com<br>bw@caplislaw.com | DATE FILED: January 22, 2021 5:18 PM<br>FILING ID: B34734CF58EF8<br>CASE NUMBER: 2021CV30252<br><br>▲COURT USE ONLY▲<br><br>Case No.:<br><br>Division/Ctrm: |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Nicole Walters, Nicholas Walters, and Shari Walters as Personal Representative, through counsel, for their Complaint, state:

EXHIBIT B

## BACKGROUND

On June 30, 2017, Jill Walters, Michael Walters, Nicholas Walters ("Nicholas"), and Nicole Walters ("Nicole") were traveling together as a family on I-76 in Colorado. The agent for CWRV Transport LLC ("CWRV"), Mark Bollinger, crashed the CWRV pickup truck into the back of a stopped vehicle at 70 miles mph. Inside the stopped vehicle were Jill Walters, Michael Walters, their two dogs and their two children Nicole Walters and Nicholas Walters. The two dogs were killed instantly. Both parents were fatally injured and Nicole and Nicholas were seriously injured. Nicholas, Nicole, and the Estates of Jill and Michael Walters filed suit against CWRW and others, seeking damages for wrongful death and negligence, among other claims. Following trial, judgment was entered against CWRV in favor of Nicholas, Nicole, and the Estates of Jill and Michael Walters in the total amount of $21,580,852.92. The judgment remains largely unsatisfied.

## PARTIES

1. Michael Don Walters and Jill M. Walters ("Mr. and Ms. Walters") are the parents of Plaintiffs Nicole and Nicholas Walters. Mr. and Mrs. Walters both died as a result of injuries sustained in an automobile crash on June 30, 2017. Mr. and Mrs. Walters are parties to this action through their estate.

2. Plaintiff Shari Walters is the personal representative of the Estates of Mr. and Ms. Walters.

3. Nicole is the surviving adult daughter and an heir of Mr. and Ms. Walters.

4. Nicholas is the surviving adult son and an heir of Mr. and Ms. Walters.

5. Defendant CWRV Transport, LLC ("CWRV") is a voluntarily dissolved Indiana limited liability company.

6. Bingo Transportation, Inc. ("Bingo" or "Wave") is an Indiana for-profit Corporation. Its principal place of business is 65856 U.S. 33 East, Goshen, Indiana, 46526. Bingo does business as Wave.

## VENUE AND JURISDICTION

7. Jurisdiction is proper in this Court pursuant to CRS § 13-1-124(1)(a) and (1)(b).

8. Judgment against Defendants was entered in Colorado (see Colorado case number 2017CVV33744).

9. The motor vehicle tort which is the subject of the aforementioned lawsuit occurred in Colorado.

2

10. Bingo did, and continues to do, business in Colorado.

11. Paragraphs 8 through 10 support Colorado's exercise of jurisdiction. *See Von Palffy-Erdoed v. Bugescu*, 708 P.2d 816 (Colo. App. 1985)(holding that a combination of transacting business in Colorado and injury in Colorado by tortious action outside the state may be sufficient contacts to support the exercise of long-arm jurisdiction).

12. "CUFTA's purpose is to protect a debtor's estate from certain depletions that prejudice the debtor's unsecured creditors . . . by establishing that a transfer is fraudulent, a creditor may be entitled to remedies, including avoiding the transfer "to the extent necessary to satisfy the creditor's claim." *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 529 (Colo. App. 2010)(citing § 38-8-108(1)(a), and *Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo. App. 2006). That is, the purpose of CUFTA is to protect creditors. Where transfers occur outside Colorado, the transfers cause detrimental consequences within Colorado and CUFTA applies.

13. Upon information and belief, Defendants are nonresidents of this state, making venue proper under C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

14. CWRV was a transportation business that transported recreational vehicles and motorhomes from the factory to the sales outlets where they will be sold directly to consumers.

15. CWRV was the main transportation carrier for Freedom Roads, LLC. Freedom Roads is either the owner or has an ownership interest or operates Camping World Holdings, Inc. (hereafter referred to as Camping World). Camping World manufactures and/or sells recreational vehicles. Camping World accounted for approximately 95% of CWRV's revenue.

16. CWRV hired drivers to deliver Camping World's RV's. The average number of drivers employed by CWRV was between 450 and 490. The highest number employed was 550.

17. Marion Schrock ("Schrock") was CWRV's Chief Executive Officer. Schrock owned 100% of CWRV.

18. In September 2019, CWRV employed approximately 20 people in addition to its drivers.

19. CWRV's 2018 gross revenue was $62,947,014. Virtually all of this revenue was generated from Camping World.

20. Mark Bollinger, one of CWRV's drivers, was involved in the crash that fatally injured Mr. and Ms. Walters on I-76 in Colorado. This crash occurred while Mr. Bollinger was in the course of a round trip delivery on behalf of CWRV.

3

21. As a result of the crash, Mr. Bollinger and CWRV were sued by Nicolas, Nicole, and the Estates of Mr. and Mrs. Walters. The lawsuit was filed on October 6, 2017.

22. On September 23, 2019, after a jury trial, a jury entered a verdict against CWRV and other defendants.

23. In early October 2019, less than two weeks after the jury award, CWRV stopped doing business and began the process of winding up its business purportedly in accordance with Indiana law.

24. On November 22, 2019, an amended order of judgment was entered against Defendants Mark Bollinger and CWRV Transport LLC, jointly and severally *i*) for the Estate of Jill Walters in the amount of $641,873.84 in principal, plus pre-and post-judgment interest through October 2, 2019 in the amount of $134,482.07, for a total of $776,355.91; *ii*) for the Estate of Michael Walters in the amount of $44,714.96 in principal, plus pre- and post-judgment interest through October 2, 2019 in the amount of $9,592.95, for a total of $54,307.91; *iii*) for Nicole Walters and Nicholas Walters for the death of their parents in the amount of $14,396,775, plus pre- and post-judgment interest through October 2, 2019 in the amount of $3,026,683.42, for a total of $17,423,458.43; *iv*) for Nicole Walters in the amount of $1,608,010, plus pre- and post-judgment interest through October 2, 2019 in the amount of $346,314.53, for a total of $1,954,324.53, and *v*) for Nicholas Walters in the amount of $1,129,210, plus pre- and post-judgment interest through October 2, 2019 in the amount of $243,196.14, for a total of $1,372,406.14. The total amount of the judgment was $21,580,852.92.

25. The judgment remains mostly unsatisfied with approximately $3,500,000 paid to date. The unpaid portion of the judgment is accruing interest at 8% per annum.

26. The judgment was domesticated in Indiana on January 7, 2020.

27. Subsequent to the entry of the amended judgment, Plaintiff's counsel commenced post-judgment proceedings in Colorado and Indiana. The discovery conducted included depositions of CWRV through its owner and designee Marion Schrock ("Schrock"), Bingo, Rob Jackson ("Jackson"), Pauline Slabaugh ("Slabaugh"), Richard Masson ("Masson"), Rhonda Rowe, Chris Johnson (representative of Camping World), Matthew Wagner, (representative of Camping World) Thomas Eby (Information Technology Specialist at CWRV), and Barry Hall, (CWRV's accountant).

28. Bingo was created by Schrock on July 30, 2009. Schrock owns 100% of Bingo.

29. While the litigation was pending, Schrock purchased the assets of Wave Express. On February 7, 2018, Dorian Carpenter and Anita Carpenter, on behalf of Wave Express, signed a Letter of Intent from Marion Schrock on behalf of a company

owned by Schrock, which at the time of the LOI was not created, to purchase the assets of Wave Express. The transaction closed in May 2018.

30. At that time Bingo acquired the assets of Wave. Wave did very little business and had very few revenues until 2019. Until 2019 it generated revenues of approximately $3 million per year.

31. On August 1, 2019, the month before the verdict, representatives from CWRV, including Schrock and CWRV's President, Jackson, attended a meeting with Camping World in Illinois.

32. Following the verdict, Jackson resigned from CWRV on October 3, 2019. His resignation was effective October 11, 2019. In his resignation letter, Jackson stated that Camping World had stated at the August 1, 2019 meeting that it intended to move its business from CWRV. Camping World denies this was ever stated or intended.

33. On October 12, 2019, the day after his resignation was effective, Jackson assumed the role of Vice President at Wave. In reality, he took control of Wave.

34. Wave's President at that time was Masson. At the time Jackson joined Wave, Wave had 3 employees and approximately 70 drivers.

35. Before Jackson joined Wave, Wave generated about $3 million per year in revenues. Its major customer had given notice that it was terminating its relationship so its revenues were expected to decrease significantly.

36. Schrock met with Camping World in early October 2019 in Illinois. At the meeting Schrock and Camping World's representatives discussed moving all of Camping World's business to Wave.

37. Richard Masson has been the President of Bingo since May 22, 2018.

38. Immediately after CWRV shut down, Masson sent a rate proposal to Camping World. The terms offered were the same as CWRV's proprietary terms.

39. Camping World accepted Wave's rate proposal.

40. Approximately three weeks after Masson sent the rate proposal, Camping World gave Wave their first load.

41. The morning of October 12, 2019, his first day of Jackson's employment with Wave, Schrock gave Jackson a list of all of the drivers working for CWRV. The list contained the drivers' cell phone numbers and contact information.

42. The drivers list was CWRV's proprietary property. Nevertheless, Schrock shared it with Jackson for the purpose of recruiting CWRVs drivers to drive for Wave.

43. Jackson began to actively solicit CWRV's drivers to drive for Wave.

44. Immediately after assuming his new role at Wave, Jackson reached out to CWRV employees to offer them employment at Wave in capacities similar to, or in some cases identical to what they were doing at CWRV.

45. By Wednesday, October 16, 2019, Wave's recruiting department had received over 350 new applications from CWRV's drivers. This was a direct result of Jackson's recruiting efforts.

46. Vehicles cannot be leased to multiple carriers. Before joining Wave, a contractor would be required to de-lease from his or her current carrier.

47. No contractor would join Wave unless they were sure that Wave had sufficient business to keep them busy because the rule against being leased to multiple carriers would preclude them from driving and earning income from a different carrier while Wave ramped up its business.

48. Jackson also began to solicit CWRV's employees to work for Wave. According to Rhonda Rowe ("Rowe"), a former employee of Wave, Bingo went from employing 3 employees to 20 employees over one weekend.

49. After CWRV employees began working at Wave, the staff had regular morning meetings where they would discuss questions they could anticipate being asked and how to answer them, including what to say and what not to say about Wave's relationship with CWRV.

50. Jackson specifically instructed Wave's employees to say that Wave is unrelated to CWRV.

51. According to Rowe, Masson told her he had destroyed all records of Wave which would show a relationship to CWRV.

52. Camping World representatives conflated CWRV with Wave in emails, showing that Camping World's understanding was the Wave is the successor entity to CWRV. For example, Carol Colaizzi, an employee of Camping World, stated in an October 18, 2019 email:

> Be it CWRV or Wave, these are two hail damaged units that need to be picked back and taken over to Kim for PDI. Can you help out with these two?

53. In a separate email, Ms. Colaizzi asks

6

> are you transitioning to Wave reporting? If so, I would really appreciate it if I can get the old CWRV for this morning.

54. On October 21, 2019, Michelle Clevenger, a prior employee of CWRV now at Wave, replied to Katie Kowalski at Camping World who inquired about orders.

> forward them to orders@waverv.com . . .Not CWRV orders email.

55. Brittany Braun, Ashley Dailey, and Shelly Seely all worked at CWRV and now work for Wave.

56. On October 25, 2019, Scott Burchett at Camping World asked Jackson.

> will you be setting up an online live tracking website like we had at CWRV.

Jackson replied affirmatively.

57. On December 13, 2019, Rosa Ramirez, an employee at Camping World, emailed Brittany Braun, Claims Manager at Wave

> just to clarify CWRV Transports is now WAVE which is you, correct? I have another claim I sent yesterday and I just to ensure it got to the correct place.

58. On October 18, 2019, CWRV sent an invoice to Camping World for Purchase Order no. 702547. The amount billed was $1,077.88. On December 16, 2019, Wave Express billed Camping World the identical amount, also for purchase order 702547. The invoices were identical for the same work.

59. But for the foregoing, it would not have been possible to get Wave up and operating as fast as it did for Wave's management team's access to CWRV's platforms, software, procedures, employees, drivers, and the relationship with Camping World.

60. All of the Camping World business of CWRV is now being handled by Wave. This business generates approximately $70 million per year in revenue.

61. In October 2019 and in response to the verdict against it in the litigation, CWRV voluntarily wound up its business.

62. After CWRV shut down, millions of dollars in revenue were received by CWRV from Camping World. This money was used to pay creditors when it should have instead gone to pay Plaintiff's judgment. CWRV paid all creditors in full except Plaintiffs who were paid $1.8 million.

63. In November 2019, Pauline Slabaugh began working for Wave.

64. Subsequent to CWRV's winding up, Schrock and Slabaugh paid creditors, including payments to multiple companies owned by Schrock. These payments were made to the exclusion of Plaintiffs, who were judgment creditors of CWRV by that time.

65. Slabaugh made the decision to pay creditors of CWRV and not to pay the Plaintiff's on her own accord.

66. In addition to paying creditors, Marion Schrock took distributions from CWRV in lieu of paying Plaintiff's judgment. The distributions were in excess of $1 million. Distributions were taken after the lawsuit was filed and in some cases after the judgment was entered.

67. CWRV paid $300,000 to their insurance company after judgment was entered against it.

68. In November 2019, Slabaugh and Schrock directed CWRV to pay $37,737 for CWRV's telephone bill, trash removal fee, utilities, repair and maintenance costs, fleet safety fees, office equipment storage fees, medical expenses, and advertising fees. These expenses were paid subsequent to Plaintiff's judgment and after CWRV had shut down its business.

69. Schrock directed that its counsel, Yoder Ainlay, be paid more than $10,000.00 and that it's accountant be paid as well. This, too, is money that could have gone to pay Plaintiff's judgment but was not.

70. Marion Schrock owns Locke Construction.

71. Locke Construction had a maintenance agreement that required it to maintain all of CWRV's yards and buildings. CWRV paid Locke Construction a $10,000.00 monthly retainer.

72. CWRV paid their $10,000.00 monthly retainer to Locke Construction in September and October 2019, after they were aware of and obligated to pay Plaintiff's judgment.

73. Marion Schrock owns HTIW Properties, LLC. HTIW Properties, LLC does business as Queen B Storage.

74. HTIW Properties, LLC owns the real estate to whom CWRV pays rent.

75. CWRV paid $21,000.00 in monthly rent to HTIW Properties.

76. CWRV paid their monthly rent to HTIW after judgment was entered against it.

77. Marion Schrock owns HPC Properties.

78. HPC Properties owns the CWRV corporate offices.

79. CWRV pays approximately $33,000 in monthly rent to HPC Properties.

80. CWRV paid their monthly rent to HPC Properties after judgment was entered against it.

81. Marion Schrock directed that CWRV pay Wave approximately $140,000 in October 2019. This was paid subsequent to the entry of judgment against CWRV and instead should have been paid to Plaintiffs.

## FIRST CLAIM FOR RELIEF
### (Fraudulent Transfer under CUFTA against Bingo d/b/a Wave Transportation)

82. Plaintiff incorporates Paragraphs 1 through 81 above as though fully set forth herein.

83. The judgment against CWRV, which was in excess of $20,000,000, made CWRV insolvent.

84. Schrock knew CWRV was insolvent at the time he wound up the company.

85. Despite knowing the CWRV was insolvent, Schrock directed CWRV to pay debts owed to companies owned by him and to pay him a distribution.

86. Schrock undertook his actions with the intent to defraud Plaintiffs, who are judgment creditors of CWRV.

87. CWRV's drivers list, which was the property of CWRV, was given to Bingo with the intent of having Bingo solicit CWRV's drivers and restarting CWRV under the trade name Wave Transportation.

88. Most of CWRV's employees now work at Bingo in the same, or similar capacities as they did at CWRV.

89. Overnight, Bingo went from a company that had just lost its largest client to a company that was generating approximately $70,000,000 per year in revenue. This would not have been possible but for CWRV's largest customer Camping World, its drivers, and its employees all moving to Bingo.

90. These actions constitute a fraudulent transfer to a present creditor pursuant to CRS § 38-8-106(2).

9

## SECOND CLAIM FOR RELIEF
### (Alternatively, Fraudulent Transfer under Indiana Uniform Fraudulent Transfer Act against Bingo d/b/a Wave Transportation)

91. Plaintiff incorporates Paragraphs 1 through 90 above as though fully set forth herein.

92. The judgment against CWRV, which was in excess of $20,000,000, made CWRV insolvent.

93. Schrock knew CWRV was insolvent at the time he would up the company.

94. Despite knowing the CWRV was insolvent, Schrock directed CWRV to pay debts owed to companies owned by him and to pay him a distribution.

95. Schrock undertook his actions with the intent to defraud Plaintiffs, who are judgment creditors of CWRV.

96. CWRV's drivers list, which was the property of CWRV, was given to Bingo with the intent of having Bingo solicit CWRV's drivers and restarting CWRV under the trade name Wave Transportation.

97. Most of CWRV's employees now work at Bingo in the same, or similar capacities as they did at CWRV.

98. Overnight, Bingo went from a company that had just lost its largest client to a company that was generating $70,000,000 per year in revenue. This would not have been possible but for CWRV's largest customer Camping World, its drivers, and its employees all moving to Bingo.

99. These actions constitute a fraudulent transfer to Indiana Code Ann. § 32-18-2 *et seq*.

## THIRD CLAIM FOR RELIEF
### (Successor Liability against Bingo d/b/a Wave Transportation)

100. Plaintiff incorporates Paragraphs 1 through 99 above as though fully set forth herein.

101. Schrock sought to purchase the assets of Wave in anticipation of a verdict against CWRV that would make CWRV insolvent.

102. A verdict in excess of $20,000,000 was entered against CWRV in September 2019.

103. In October 2019, CWRV began the process of winding up its business.

104. Less than two weeks after voluntarily resigning from CWRV, Rob Jackson assumed the role of Vice President at Wave.

105. Contemporaneous with his employment at Wave, Jackson began soliciting CWRV's prior employees.

106. Of the 20 employees at CWRV, 18, or 90%, became employed by Wave in the same or similar capacity.

107. Schrock gave Jackson CWRV's list of drivers. Jackson immediately began soliciting those drivers to drive for Wave.

108. Hundreds of CWRV's drivers began driving for Wave only weeks after CWRV shut down.

109. Masson, Wave's President, sent Camping World a rate proposal that was nearly identical to the same terms offered to Camping World by CWRV.

110. Camping World accepted Wave's rate proposal.

111. In less than a month, Wave went from having minimal revenues to generating millions of dollars a month in revenue from Camping World alone.

112. The same employees, many of the same drivers, and the same customer on the same terms establish that Wave is the successor entity to CWRV.

## FOURTH CLAIM FOR RELIEF
### (Fraud against Marion Schrock and CWRV Transport, LLC)

113. Plaintiff incorporates Paragraphs 1 through 112 above as though fully set forth herein.

114. CWRV misrepresented the truth when it said that it would wind up its business. In fact, CWRV is now doing business under the trade name of Wave Express.

115. This is a material fact because but for CWRV's alleged winding up, Plaintiff's judgment, or a substantial part of it, would have been paid.

116. CWRV intended to move its business to Wave Express so that it could avoid paying the verdict that was entered against it.

117. As a result of CWRV's actions, Plaintiffs' judgment has gone unpaid and they have been forced to file this lawsuit.

## FIFTH CLAIM FOR RELIEF
### (Indiana Law regarding Winding Up)

118. Plaintiff incorporates Paragraphs 1 through 117 above as though fully set forth herein.

119. Pursuant to Indiana Code Ann. § Ind. Code Ann. § 23-18-9-6, upon the winding up of an Indiana Limited Liability Company, assets must be distributed to creditors before being distributed to members. CWRV violated this law when it made distributions to Marion Schrock and companies owed or controlled by him after judgment was entered against it.

120. Pursuant to Ind. Code Ann. § 23-18-9-8, a dissolved limited liability company must notify known claimants in writing of the dissolution at any time after the dissolution through a formal notice process. That notice was never given to the Walters.

121. CWRV's actions precluded the Walters from asserting a claim against CWRV as part of the winding up process.

122. Schrock and his companies must disgorge the distributions and payments made to them.

## SIXTH CLAIM FOR RELIEF
### (Conspiracy against Schrock and Slabaugh)

123. Plaintiff incorporates Paragraphs 1 through 122 above as though fully set forth herein.

124. A transfer in violation of CUFTA is a legal wrong which will support a conspiracy claim. See *Double Oak Const. v . Cornerstone Dev. International, LLC*, 97 P.3d 140 (2004).

125. Schrock and Slabaugh acted in concert to pay existing creditors, including multiple businesses owned by Schrock himself, before paying Plaintiff's judgment.

126. Schrock and Slabaugh made this decision with the intent not to pay Plaintiff's their judgment.

127. As a result of Schrock and Slabaugh's actions, Plaintiffs' judgment has gone largely unpaid and this lawsuit was filed to obtain access to assets that otherwise would have been used to satisfy the judgment.

128. Schrock and his companies must disgorge the distributions and payments made to them.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting a Conspiracy against Schrock and Slabaugh)

129. Plaintiff incorporates Paragraphs 1 through 128 above as though fully set forth herein.

130. "One who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty [civil conspiracy] participant, and in the eye of the law is equally guilty with the one who does the [unlawful] act." *Nelson v. Elway*, 908 P.2d 102, 113 (Colo. 1995).

131. Schrock and Slabaugh acted in concert to pay existing creditors, including multiple businesses owned by Schrock himself, before paying Plaintiff's judgment.

132. Schrock and Slabaugh made this decision with the intent not to pay Plaintiff's their judgment.

133. As a result of Schrock and Slabaugh's actions, Plaintiff's judgment has gone largely unpaid and this lawsuit was filed to obtain access to assets that otherwise would have been used to satisfy the judgment.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues so triable.

WHEREFORE, Plaintiffs request that judgment enter against Defendants as follows:

A. For judgment in favor of Plaintiff against Wave and Schrock for one and one half times the value of the assets transferred from CWRV to Wave, pursuant to CUFTA; or the Indiana fraudulent transfer statute.

B. For Plaintiffs' attorneys fees and costs in pursuing enforcement of their rights under CUFTA;

C. For judgment in favor of Plaintiff and against Wave, Schrock, and Slabaugh, jointly and severally, for conspiring to fraudulently transfer CWRV's assets to Wave;

D. Alternatively, for attachment on the assets of CWRV in the possession of Wave and/or Schrock;

E. For a declaration that Wave is the successor entity to CWRV and that Wave succeeds to all of the obligations and liabilities of CWRV;

F.  For disgorgement of the assets transferred from CWRV to Wave and the appointment of receiver with respect to such assets;

G.  For disgorgement of the distributions from CWRV to Schrock and companies owned or controlled by him;

H.  For pre- and post-judgment interest as provided by Colorado law; and

I.  For any other relief to which the Court deems just and proper.

SWEETBAUM SANDS ANDERSON PC

By: /s/Alan D. Sweetbaum
Alan D. Sweetbaum, #13491
*Attorneys for Plaintiffs*

Plaintiffs' Address:
7771 S. Huron Court
Littleton, CO 80120-8042